**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PROTECT OUR COMMUNITIES
FOUNDATION; DAVID HOGAN; NICA
KNITE,

*Plaintiffs-Appellants*,

v.

DARRYL LACOUNTE, Acting
Director, Bureau of Indian Affairs;
DAVID L. BERNHARDT, Secretary,
Department of the Interior; TARA
KATUK MACLEAN SWEENEY,
Assistant Secretary for Indian
Affairs; AMY DUTSCHKE, Regional
Director, Bureau of Indian Affairs
Pacific Region; JOHN RYDZIK, Chief,
Bureau of Indian Affairs Pacific
Region Division of Environmental
Cultural Resources Management &
Safety,

*Defendants-Appellees*,

TULE WIND, LLC; EWIIAAPAAYP
BAND OF KUMEYAAY INDIANS,

*Intervenor-Defendants-*
*Appellees.*

No. 17-55647

D.C. No.
3:14-cv-02261-
JLS-JMA

OPINION

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted November 14, 2018
Pasadena, California

Filed September 23, 2019

Before:  Ronald M. Gould and Mary H. Murguia, Circuit
Judges, and Carol Bagley Amon,[*] District Judge.

Opinion by Judge Gould

## SUMMARY[**]

### Environmental Policy

The panel affirmed the district court's summary
judgment in favor of Bureau of Indian Affairs ("BIA")
officials, Tule Wind, LLC and Ewiiaapaayp Band of
Kumeyaay Indians in an action challenging the BIA's
approval of an industrial-scale wind facility in Southern
California.

Tule plans to construct eighty-five wind turbines, and the
project was split into two phases. Phase I concerned sixty-

---

[*] The Honorable Carol Bagley Amon, United States District Judge
for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

five turbines constructed on federal land, requiring approval from the Bureau of Land Management ("BLM").  Phase II concerned twenty turbines on the Tribe's reservation, requiring approval from the BIA, which serves as a trustee for the Tribe.  BLM prepared an environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA") that covered both phases.  BIA approved Phase II in a Record of Decision that relied on BLM's EIS and Tule's Supplemental Protection Plan.

The panel considered plaintiffs' contention that BLM's reliance on the EIS was improper because BIA did not explain its decision not to implement one of the EIS's listed mitigation measures.  The panel agreed with the defendants that the BIA did follow the command of this mitigation measure, and for that reason, did not need to explain its decision not to implement it.

The panel next considered plaintiffs' contention that the EIS's consideration of five action alternatives was deficient because it did not consider an alternative where only some of the Phase II turbines were authorized.  The panel held that the issue was properly preserved, and not waived.  The panel further held that viewing the project as a whole, the alternatives analysis was sufficient.

Plaintiffs argued that BIA should have prepared a supplemental EIS to analyze information that arose after the EIS was published.  The panel considered five grounds asserted by plaintiffs in support of their argument, and concluded that additional environmental review was not required.

The panel rejected plaintiffs' challenges to BIA's decision not to require Tule to obtain an eagle take permit

under the Bald and Golden Eagle Protection Act ("BGEPA") from the U.S. Fish and Wildlife Service. BIA did not require Tule to obtain a permit before Tule began construction as the Service had urged, and only required Tule to apply for a permit before it began operation of the turbines. The panel rejected plaintiffs' false contention that BIA intimated that Tule could comply with BGEPA merely by applying for a permit. The panel held that BIA's authorization was not in any way a violation of the law because the BIA, like the BLM, required Tule to apply for a permit and required Tule to comply with all applicable laws. In addition, the panel held that the BIA did not act arbitrarily and capriciously by not conditioning its approval of Phase II on Tule obtaining a permit.

The panel concluded that in the total circumstances of this case, the EIS analysis was sufficient to satisfy NEPA, and so far as the demands of NEPA and the Administrative Procedure Act were concerned, this project could proceed.

## COUNSEL

William S. Eubanks II (argued), Meyer Glitzenstein & Eubanks LLP, Fort Collins, Colorado; William N. Lawton, Meyer Glitzenstein & Eubanks LLP ,Washington, D.C.; for Plaintiffs-Appellants.

Allen M. Brabender (argued), Brian Collins, and John H. Martin, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Jeffrey Durocher, Portland, Oregon; for Intervenor-Defendant-Appellee Tule Wind, LLC.

Bradley G. Bledsoe Downes, Bledsoe Downes PC, Chandler, Arizona, for Intervenor-Defendant-Appellee Ewiiaapaayp Band of Kumeyaay Indians.

## OPINION

GOULD, Circuit Judge:

Plaintiffs Protect Our Communities Foundation, David Hogan, and Nica Knite ("Plaintiffs") challenge the decision of the Bureau of Indian Affairs ("BIA") to approve an industrial-scale wind facility in Southern California. The district court granted summary judgment to Defendant BIA officials, Defendant-Intervenor Tule Wind, LLC ("Tule"), and Defendant-Intervenor Ewiiaapaayp Band of Kumeyaay Indians ("the Tribe") (collectively, "Defendants"). We affirm.

## I

Tule plans to construct eighty-five wind turbines about sixty miles east of San Diego, California. During the planning and approval process, the project was split into two phases. Phase I concerned sixty-five turbines constructed on federal land in a valley and required approval from the Bureau of Land Management ("BLM"), which is responsible for granting rights-of-way for use of federal lands. Phase II concerned twenty turbines on the Tribe's reservation on ridgelines above the valley. Phase II required approval from BIA, which serves as a trustee for federally recognized Indian tribes.

Before BLM and BIA approved the respective phases, the agencies were required to analyze environmental impacts under the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.  BLM prepared an environmental impact statement ("EIS") that covered both phases.

Among other environmental impacts, the EIS expressly identified an "unavoidable adverse impact" to golden eagles from collisions with the turbines and loss of breeding territory, impacts that were especially acute for the Phase II turbines.  The EIS considered five project alternatives for the Tule project, including one that would eliminate 63 turbines, including all of the Phase II turbines, from the 128 that were originally proposed.

For Phase I, Tule drafted a Project-Specific Avian and Bat Protection Plan ("Protection Plan") that described possible means of mitigating bird and bat impacts in detail. Relying on that plan and the EIS, BLM approved Phase I. Importantly, that approval survived review in this court.  *See Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 577 (9th Cir. 2016) [hereinafter "*Protect Our Communities I*"].

For Phase II, Tule drafted a Supplemental Project-Specific Avian and Bat Protection Plan ("Supplemental Protection Plan") that included updated eagle surveys and described measures to document and avoid bird impacts. The Supplemental Protection Plan concluded that, with mitigation measures, Phase II could "meet the current no-net loss standard for local breeding eagle populations."  BIA made the Supplemental Protection Plan available for public comment.  The United States Fish and Wildlife Service ("FWS"), among other entities, criticized the Supplemental Protection Plan's methodologies and conclusion.

BIA approved Phase II in a Record of Decision ("ROD") that relied on BLM's EIS and Tule's Supplemental Protection Plan.  The ROD adopted several mitigation measures designed to avoid impacts to golden eagles.  These mitigation measures included a requirement that before operating, Tule had to apply for an eagle take permit under the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668.

Plaintiffs challenged BIA's approval in the district court, asserting three alleged errors.  The district court granted Defendants' motion for judgment on the pleadings on two of the claimed errors and granted Defendants' motions for summary judgment on the third.  Plaintiffs timely appealed.

## II

A district court's grant of summary judgment is reviewed de novo.  *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).  Dismissal on the pleadings pursuant to Rule 12(c) is also reviewed de novo.  *See Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1246 (9th Cir. 2017).

Under the Administrative Procedure Act ("APA"), we review agency action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts in an "arbitrary and capricious" manner when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As a general rule, we will "uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made.'" *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003)).

In addition to APA challenges, Plaintiffs raise challenges under NEPA. NEPA requires agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must contain, among other things, a detailed discussion of "the environmental impact of the proposed action," "adverse environmental effects which cannot be avoided," "alternatives to the proposed action," and possible mitigation measures. *Id.*; 40 C.F.R. § 1502.16. If multiple federal agencies are "involved in the same action" or "involved in a group of actions directly related to each other," then "[a] lead agency shall supervise" the EIS preparation, or the agencies may act as joint lead agencies. 40 C.F.R. § 1501.5.

After finalizing the EIS, the agency must select a course of action within the range of alternatives analyzed and issue an ROD. *Id.* § 1505.1. The ROD explains why the agency chose a particular alternative, whether all practical means for avoiding or minimizing environmental harm have been adopted, and, if not, why not. *See id.* § 1505.2.

NEPA requires these procedural steps but does not require an agency to reach any particular result. *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). Rather, compliance with NEPA involves the application of a "rule of reason," which involves "a pragmatic judgment whether the EIS's form, content, and

preparation foster both informed decision-making and informed public participation." *Churchill Cty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).

Nevertheless, a reviewing court will ensure that the agency took a "hard look" at the EIS to determine whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* at 1071–72 (quotation marks omitted).    NEPA favors "coherent and comprehensive up-front environmental analysis to ensure . . . that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* at 1072–73 (quotation marks omitted).

## III

## A

BIA relied on BLM's EIS, which addressed both Phase I and Phase II, to satisfy its NEPA review requirement. *See* 42 U.S.C. § 4332(2)(C).  Plaintiffs contend that that reliance was improper because BIA did not explain its decision to not implement one of the EIS's listed mitigation measures, MM BIO-10f.  That measure provides:

> Authorize construction of portions of the project based on the results of behavioral and population studies of local golden eagles: Construction of [Phase II] would occur at those turbine locations that show reduced risk to the eagle population following analysis of detailed behavior studies of known eagles in the vicinity of the Tule Wind project. Pending the outcome of eagle behavior

studies, all, none, or part of the second portion of the project would be authorized. . . . The final criteria determining the risk each location presents to eagles will be determined [by BIA] in consultation with the required resource agencies, tribes, and other relevant permitting agencies . . . . Turbine locations exceeding the acceptable risk levels to golden eagles based on these final criteria will not be authorized for construction.

Defendants respond that in fact BIA did follow the command of this mitigation measure and, for that reason, did not need to explain its decision not to implement it. We agree. First, BIA considered whether to "authorize construction of portions of the project," by considering each turbine and finding that all twenty satisfied the criteria for authorization. Second, BIA considered "the risk each location presents to eagles" in the Supplemental Protection Plan; in particular, the Supplemental Protection Plan discussed whether to cease daytime operation for certain turbines close to specific nests.

Third, BIA satisfied the requirement to establish "final criteria determining the risk each location presents to eagles" and evaluate "acceptable risk levels to golden eagles based on these final criteria." The Supplemental Protection Plan outlined how Phase II was expected to meet FWS's "no-net loss standard" for local breeding eagles. BIA determined that all ridgeline turbines could, with certain mitigation measures, be constructed in a way that met that criteria. And it further determined that the "primary period of risk" occurs at certain turbines and decided to limit daytime operations of those turbines. Finally, BIA meaningfully consulted with

FWS by hearing comments from FWS throughout the process and relying on FWS protocols for BIA's study of the risk to eagles. BIA was not required to explain why it did not adopt a mitigation measure that it did in fact follow.

Similarly, we reject Plaintiffs' related argument that BIA should have explained why its ROD found no significant impacts to eagles, even though the EIS had concluded that the entire project would impact the eagles. There is no discrepancy: the EIS considered whether the entire project would have any impact on eagles, whereas the Supplemental Protection Plan considered whether Phase II would have significant impacts, taking into account the Supplemental Protection Plan's mitigation measures and analysis.

**B**

An EIS must evaluate "all 'reasonable [and] feasible' alternatives in light of the ultimate purposes of the project." *Protect Our Communities I*, 825 F.3d at 580 (quoting *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)). Here, the EIS considered five action alternatives in light of the purpose to "facilitate the timely development of [the Tribe's] wind and solar energy resources through tribal renewable energy projects." Four alternatives contemplated construction of all turbines, with other changes to the transmission facilities. The fifth alternative eliminated about half of the turbines, including all of the Phase II turbines. Plaintiffs contend that this analysis was deficient because it did not consider an alternative where only some of the Phase II turbines were authorized. BIA responds that Plaintiffs failed to exhaust this argument, and that, in any event, BIA satisfied the requirement to consider reasonable alternatives.

**1**

Plaintiffs "must structure their participation" in the agency's decisionmaking process so as to "alert[] the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)). Otherwise, the issue is waived. *Id.*[1]

To determine whether this requirement is met, we are guided by its purpose, which is "to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010). The issue need not have been raised "using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised." *Id.* The agency simply must have "sufficient notice . . . to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002).

Generally, "[w]e will not invoke the waiver rule . . . if an agency has had an opportunity to consider the issue . . . even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Portland Gen. Elec. Co.*, 501 F.3d at 1024; *see also 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th

---

[1] "While the principle has sometimes been phrased in terms of standing or exhaustion, *see Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986); *Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984), we have made clear that it is best characterized as waiver." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir. 2007).

Cir. 2006) (issue exhausted where the record was "replete with evidence that the [agency] recognized the specific shortfall" raised). In the context of an agency's analysis of alternatives, the Supreme Court has suggested that where no one has "identified in their comments any rulemaking alternatives beyond those evaluated" by the agency or "urged [the agency] to consider alternatives," the issue is waived. *Pub. Citizen*, 541 U.S. at 765.

Plaintiffs point to several BIA and third-party statements to argue that BIA had an opportunity to rectify any deficiency in its alternative analysis. Some comments Plaintiffs cite merely highlight the ridgeline turbines' threat to eagles or urge that the entire project should be abandoned. But other comments make clear that BIA was aware that a different number of turbines and different siting decisions were possible and potentially desirable. For example, the mitigation measure discussed above noted the possibility that "all, none, or part" of Phase II could be authorized. BIA itself acknowledged in a comment on the EIS that "specific turbines could be eliminated if it is determined that risks outweigh benefits." In an email, an FWS official "recommend[ed] that BLM include an alternative in the NEPA document that allows for flexibility in regards to phasing the project as eagle monitoring information is collected."

The United States Environmental Protection Agency ("EPA") encouraged BLM and Tule to "relocate, reduce, or eliminate portions of the project footprint that . . . would adversely affect threated, endangered, or sensitive species." In a letter addressing BLM's ROD, the Tribe's Chairman

requested that Tule remove one of the turbines that posed a particular threat to eagles in the area.[2]

None of these comments precisely alerted BIA that NEPA might require it to consider an alternative that included only some of the ridgeline turbines. But we do not require "precise legal formulations." *Lands Council*, 629 F.3d at 1076. *Public Citizen* indicates that to preserve an argument that an alternatives analysis is deficient, comments must merely identify "any rulemaking alternative beyond those evaluated" or urge the agency "to consider alternatives." 541 U.S. at 764. *Public Citizen* did not require comments that explained the precise legal challenge, that is, the agency's "failure to properly consider possible alternatives to the proposed action." *See id.* Here, comments did identify alternatives: for example, EPA suggested that BLM "eliminate portions of the project footprint"; the Tribe's Chairman asked Tule to remove one of the turbines from the project; and BIA itself suggested that specific turbines could be eliminated. We conclude that the issue is preserved.

**2**

"In order to be adequate, an environmental impact statement must consider not every possible alternative, but every reasonable alternative." *Citizens for a Better*

---

[2] Plaintiffs also highlight comments that arose after the EIS was finalized. Some precedent suggests that issues must be preserved before the EIS is finalized. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 604–05 (9th Cir. 2018); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1156 & n.2 (9th Cir. 2008); *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1249 (9th Cir. 2000). Because we do not rely on those comments, we do not reach this issue.

*Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985). "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives . . . ." *City of Carmel-by-the-Sea*, 123 F.3d at 1155. An agency need not consider alternatives that are "unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996).

We reject Defendants' argument that *Protect Our Communities I* controls this case. There, we held that "the range of alternatives considered in the EIS was not impermissibly narrow, as the agency evaluated all 'reasonable and feasible' alternatives in light of the ultimate purpose of the project." 825 F.3d at 580. But that holding cannot control this case: that lawsuit was filed before BIA issued its ROD, and we did not address whether BIA's approval violated NEPA.

Nevertheless, we hold that the alternatives analysis was also sufficient as to BIA's approval. If we were viewing Phase II as an isolated project, and not as part of a larger wind energy development, we might agree with Plaintiffs that the alternatives analysis was insufficient. In *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800, 813 (9th Cir. 1999) (per curiam), we held that an alternatives analysis was deficient because it "considered only a no action alternative along with two virtually identical alternatives." Here, as to the Phase II turbines alone, the EIS effectively considered one no action alternative (alternative five) and four identical alternatives. No mid-range alternative, such as an alternative contemplating only ten of the turbines, was considered. If Phase II constituted the entire project, then, *Muckleshoot* would require us to conclude that the alternatives analysis was deficient.

We do not think it appropriate, however, to view Phase II as an isolated project. It is not: instead, the twenty Phase II turbines are part of a wind turbine development that originally included over one hundred turbines, to be built by the same developer in the same general area but split along a jurisdictional line. Although the project was split along a jurisdictional line, Phase I and Phase II make up one and the same project.

Indeed, we require agencies to issue a single EIS for "connected, cumulative, and similar actions" like this project. *Dombeck*, 304 F.3d at 894 (quoting *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir. 2000)). This requirement "prevent[s] an agency from 'dividing a project into multiple "actions," each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* We cannot at the same time require agencies to combine actions in order to produce an EIS but turn around and divide the actions when we evaluate the sufficiency of the alternatives analysis.

Viewing the project as a whole, then, the alternatives analysis was sufficient. Although no mid-range alternative was considered as to the twenty Phase II turbines, the EIS's fifth alternative did consider a mid-range alternative for the project as a whole: construction of 63 out of 128 turbines. Indeed, BLM ultimately approved a configuration with fewer turbines than had been initially proposed.

Of course, an analysis of a larger project may not always be sufficient to satisfy NEPA for a smaller portion of it. In *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013), we held that an alternatives analysis was sufficient as to the programmatic EIS, but insufficient as to

the site-specific environmental assessment.**[3]** "Site-specific impacts," we reasoned, must be evaluated once the "critical decision has been made to act on site development." *Id.* at 1049 (quoting *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003), *opinion clarified*, 366 F.3d 731 (9th Cir. 2004)). Because neither document fully considered a mid-range alternative, the agency was deprived of "information on the environmental impacts of the unconsidered alternatives." *Id.* at 1050.

Similarly, in *Muckleshoot*, we held that the agency's prior consideration of an issue could not save a deficient EIS because the earlier discussion did not "account for the specific impacts" of the project at issue. 177 F.3d at 810; *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004). We likewise held that where an agency failed to consider alternatives to a project in a programmatic EIS, it "had an obligation to consider such alternatives in the [site-specific] EIS." *'Ilio'ulaokalani Coal.*, 464 F.3d at 1092.

This line of precedent makes sense: a site-specific project demands site-specific analysis. Agencies cannot rely on a general discussion in a programmatic EIS or other document to satisfy its NEPA obligations for a site-specific action. But here, the EIS did address the site-specific action. The details of the project were known, and the EIS specifically addressed its environmental impacts and considered a mid-range alternative. Unlike the Forest Service in *Muckleshoot* and the BLM in *Klamath-Siskiyou*, the BIA is not "attempt[ing] to save" a deficient analysis by

---

**[3]** A programmatic EIS "is used to assess the environmental impacts of a proposed action that is broad in reach, such as a program, plan, or policy . . . ." 45 C.F.R. § 900.207.

reference to a more general document. *Klamath-Siskiyou*, 387 F.3d at 998.

Plaintiffs point out that the EIS appeared to contemplate further analysis of the environmental impacts of the Phase II turbines in particular. But an agency's desire for even more information about the environmental impacts of a project does not mean that the alternatives were not adequately analyzed. Here, they were.

Finally, we note that we do not confront circumstances where Defendants were entirely unaware of the possibility of alternatives to the twenty-turbine configuration. Our precedent suggests that a non-NEPA document cannot cure the deficiencies of an EIS. *See Muckleshoot*, 177 F.3d at 811. But Plaintiffs' suggestion that BIA failed to consider any alternatives "that entailed building some but not all of the proposed ridgeline turbines," either in the EIS or in "any subsequent document" is inaccurate. The EIS specifically contemplated that "all, none or part of the second portion of the project would be authorized." Subsequent to the promulgation of the EIS, the Supplemental Protection Plan considered seven plans in which the turbines most threatening to the eagle population would be curtailed during times of high eagle activity. These plans were similar to consideration of a less-than-full build. In addition, in response to a comment to the Supplemental Protection Plan raised by FWS asking BIA to consider a build of only the six southernmost turbines, BIA explained why this mid-range alternative would not have been practical, noting that "development of only 6 turbines would not be sufficient to justify the investment in infrastructure to access the 6 turbines which would result in no revenue source for the [Tribe]." Although we do not suggest that post-EIS analysis can serve as a substitute for EIS reasonable alternative

analysis, these documents make it plain that BIA did not simply ignore the issue.

## C

Next, Plaintiffs argue that BIA should have prepared a supplemental EIS ("SEIS") to analyze information that arose after the EIS was published.

In general, NEPA requires agencies to prepare an SEIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). We have held that NEPA does not require agencies to prepare an SEIS "every time new information comes to light" but instead requires agencies to "maintain a 'hard look' at the impact of agency action when the 'new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered.'" *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989)).

Plaintiffs assert five grounds in support of their argument, but we are not persuaded that additional environmental review was required. First, Plaintiffs contend that information in the Supplemental Protection Plan, along with third-party comments on that plan, met the "new and significant" threshold requiring an SEIS. Whether new information is sufficiently significant to necessitate an SEIS "turns on the value of the new information to the still pending decisionmaking process." *Marsh*, 490 U.S. at 374.

Plaintiffs specify several new pieces of information that they say triggered BIA's duty to prepare an SEIS. New surveys described in the Supplemental Protection Plan revealed at least eight occupied golden eagle territories within ten miles of Phase II, two at which young had been successfully produced, and two at which eaglets failed to fledge. The Plan also indicated that the nests nearest Phase II continued to be active, and that the flight path of its fledglings overlapped with all of the turbine sites. It further revealed that no eagle territory produced young in every year. In addition, new flight surveys showed that 73 of 123 documented eagle flight paths traversed Phase II. Finally, comments from FWS raised concerns about BIA's lack of expertise on potential impacts to eagles, as well as the importance of the nearby nest to eagle populations in the areas and to FWS's plans.

Although some details are more specific than information discussed in the EIS, the facts identified by Plaintiffs are not both new and significant. The EIS recognizes the presence of eagle territories in the area, the movement of those eagles from different territories in different years with varying levels of reproductive success, and the existence of the territory nearest Phase II. The EIS also discloses that eagles traverse the Phase II ridgeline. Throughout, the EIS acknowledges that the project poses a threat to eagles. Although aspects of FWS's opposition could be characterized as "new," it does not suggest the project will impact the environment "to a significant extent not already considered." *Marsh*, 490 U.S. at 374. We agree with the district court that the new information is not significant because "it merely confirmed concerns that the 2011 EIS already articulated and considered." *Protect Our Communities Found. v. Black*, 240 F. Supp. 3d 1055, 1067 (S.D. Cal. 2017).

Second, Plaintiffs argue that BIA cannot rely on the EIS (without supplemental review) because the EIS "rejected" the Phase II turbines.

In *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 559 (9th Cir. 2006), we held that an agency could not rely on an EIS to take an action where the EIS "unequivocal[ly] reject[ed]" that action.  We reasoned that an EIS cannot supply the requisite environmental analysis to support a decision directly contrary to its conclusions.  *Id.* In that case, we required the agency to conduct supplemental environmental review.  *Id.*

But here, the EIS did not "reject" the Phase II turbines. Instead, it determined that the ridgeline turbines posed particular risks to the eagles and that further study was required to understand and potentially mitigate those risks. The EIS fully contemplated and considered potential environmental impacts of the Phase II turbines, and the BIA took steps to mitigate risks.

Third, Plaintiffs argue that the new information required an SEIS because it met the criteria for "significance" under NEPA regulations.    *See* 40 C.F.R. § 1508.27(b). Specifically, Plaintiffs contend that new information showed that Phase II is (1) close to cultural resources and ecologically critical areas; (2) highly controversial; (3) related to other actions with individually insignificant but cumulatively significant impacts, i.e., other energy projects in the area that threaten eagles; and (4) in violation of federal law.  But the EIS had already addressed (1) the impact to eagles, and the cultural importance of the eagles; (2) FWS's comments critical of BIA's conclusions and analysis; (3) additional impacts to eagles from other developments; and (4) FWS's concern that Phase II will not qualify for a take permit under the BGEPA.  In short, any

additional information did not raise new issues that were "not already considered" in the EIS. *Marsh*, 490 U.S. at 374.

Fourth, Plaintiffs argue that BIA's failure to prepare additional environmental analysis violated the APA's "hard look" requirement because it did not adequately respond to the comments of FWS and CDFW. In *Friends of the Clearwater v. Dombeck*, we said that "[a]n agency that has prepared an EIS cannot simply rest on the original document"; instead, it "must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action.'" 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh*, 490 U.S. at 371).[4] We conclude that BIA did, in fact, continue to maintain a hard look at the environmental impacts, as is shown by the extensive discussion on the impacts to golden eagles in the ROD and Supplemental Protection Plan. We hold that BIA satisfied the "hard look" requirement.

Fifth and finally, Plaintiffs contend that Defendants were required to, but did not, assess the significance of the new information. Agencies must evaluate new information's significance and make a reasoned determination of whether

---

[4] Plaintiffs cite *League of Wilderness Defenders*, 309 F.3d at 1192, for the proposition that "the apparently unanswered concerns of a sister agency simply do not measure up to the requirements in this Circuit for a 'hard look.'" But Plaintiffs take that quote out of context; what the court says is that "the lack of any analysis" whatsoever of an environmental impact, "*coupled with* contradictory statements in the Project Guidelines, EIS, Record of Decisions, *and* the apparently unanswered concerns of a sister agency" do not measure up to our hard look requirements. *Id.* (emphases added). Here, even if BIA left some of FWS's concerns unanswered, it did so in a context where, in contrast to *Forsgren*, its EIS, ROD, and Supplemental Protection Plan had thoroughly considered the key issues that the other agency raised.

it is of such significance as to require a supplemental EIS. *See id.* at 558. In *Dombeck*, we held that an agency erred where there was "no evidence in the record" that the agency even "considered whether [the interim designation of seven new sensitive species was] sufficiently significant to require preparation of [a supplemental EIS]." *Id.* But in *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 855 (9th Cir. 2013), we held that, at least where a change in project design is at issue, an ROD that states that the EIS "fully analyzed" the relevant questions satisfied the requirement to assess the need for supplemental analysis.

Here, the ROD states that the EIS "included an analysis of all environmental issues associated with construction and operation" of Phase II turbines. As discussed above, no new environmental issues, such as a new sensitive species designation, arose in the interim. Moreover, BIA addressed almost all of the purportedly new information in the ROD, the Supplemental Protection Plan, and its response to comments, even if it never stated that the information was not "significant" and therefore did not require more analysis.

## D

Plaintiffs' final two challenges to BIA's decision concern the agency's decision not to require Tule to obtain a BGEPA permit from FWS. FWS recommended that BIA condition its approval on Tule obtaining a BGEPA permit from FWS. FWS pointed out that requiring a permit before approval would allow Tule to consider different turbine siting designs in response to BGEPA permit requirements before construction began on the turbines—before it was too late to make necessary modifications to comply. FWS also suggested that the design BIA approved would "not likely meet the conservation standard" for golden eagles and would not likely receive a BGEPA permit.

Despite FWS's concerns, BIA only required Tule to apply for a permit before it began operation of the turbines. BIA did not require Tule to obtain a permit before Tule began construction, as the FWS had urged BIA to do. Nevertheless, the ROD explicitly noted that Tule "must comply with all applicable Federal laws, including any requirements for an eagle take permit under the BGEPA." And BIA warned that "any take of eagles caused by the Project, prior to the issuance of an eagle take permit, constitutes a violation of the [Eagle Act] that the FWS may refer to the Department of Justice for enforcement."

We firmly reject Plaintiffs' false contention, pressed at oral argument, that BIA intimated that Tule could comply with BGEPA merely by applying for a permit. To the contrary, the ROD said that Tule would comply with BIA's requirements for approval by applying for a permit. No person could seriously suggest that Tule would comply with BGEPA's requirement merely by applying for a permit. To the contrary, the ROD confirms that Tule must comply with "any requirements for an eagle take permit under the BGEPA" and spells out the consequences of noncompliance. If Tule were to violate the BGEPA, it would do so at the risk of civil and criminal penalties.

**1**

We next address Plaintiffs' argument that BIA's decision was not in accordance with the law. Under the APA, federal agency action is invalid if it is "not in accordance with the law." 5 U.S.C. § 706(2)(A). Applying this rule, we have invalidated agency action that sanctioned unlawful conduct by third parties. *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 480 (9th Cir. 2004) (holding agency erred by permitting unlawful hunting of whale in reliance on an incorrect legal interpretation); *Wilderness Soc'y v. U.S. Fish & Wildlife*

*Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003) (en banc) (holding agency erred by permitting "commercial enterprise" in area where commercial activities were prohibited by statute).

But we explained in *Protect Our Communities I* that "the APA does not target regulatory action by [an agency] that permits a third-party grantee like Tule to engage in otherwise lawful behavior, and only incidentally leads to subsequent unlawful action by that third party." 825 F.3d at 586. We noted that "BLM's right-of-way did not sanction or authorize the taking of migratory birds without a permit; it authorized the development of a wind-energy facility." *Id.* at 587. We reasoned that "[w]ithout further indication of its involvement in the putative violation, we cannot hold the BLM complicit in future unlawful activity, separately committed by a grantee, through a mere failure to intervene at the permitting stage." *Id.*

That prior holding controls this case. Plaintiffs attempt to distinguish *Protect Our Communities I* on the basis that the Phase II turbines pose a far greater threat to golden eagles than the Phase I turbines. But our reasoning in *Protect Our Communities I* did not depend on the degree of risk to eagles. Instead, we emphasized that BLM had not authorized the take of eagles without securing permission from FWS. *Id.* at 587 (noting that BLM "has not sanctioned or encouraged an unlawful course of action by Tule," and instead it "has done the opposite" by requiring compliance with "all applicable laws and regulations"). *Protect Our Communities I* forecloses Plaintiffs' challenge to BIA's decision: because BIA, like BLM, required Tule to apply for a permit, and required Tule to comply with all applicable laws, BIA's authorization was not in any way in violation of the law.

**2**

Plaintiffs further contend that BIA acted arbitrarily and capriciously by not conditioning its approval of Phase II on Tule obtaining a permit, especially where FWS had urged BIA to do so.

Under the arbitrary and capricious standard, "we are not to substitute [our] judgment for that of the agency." *State Farm*, 463 U.S. at 43. A decision is arbitrary and capricious only if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

We agree that for practical reasons it will be best for Tule to seek a permit early in the construction process before it is too late to make modifications that the BGEPA may require. But as we emphasized in *Protect Our Communities I*, Tule's compliance with the BGEPA is between Tule and FWS. 825 F.3d at 588 ("BLM . . . is neither statutorily tasked with policing third-party compliance with the Eagle Act nor responsible for violations that might be independently committed by grantees, such as Tule."); *see also* 74 Fed. Reg. 44,843 (Sep. 11, 2009) (FWS regulation explaining that "[p]ersons and organizations that obtain licenses, permits, grants, or other such services from government agencies are responsible for their own compliance with the Eagle Act and should individually seek permits").

Because compliance is Tule's responsibility, BIA's decision not to require the grant of the permit was not irrational. Indeed, BIA had a sensible reason not to condition its approval on Defendants' obtaining a permit. As BIA explained in its ROD, FWS's guidelines for BGEPA

permits were "not yet final" at the time BIA intended to finalize its approval.  Rather than wait for FWS to finalize its guidelines and issue (or deny) a permit, BIA decided to get its own approval out of the way—without interfering with FWS's administration of the BGEPA, and ensuring that Tule was well aware of its obligations under BGEPA and other federal laws.  BIA's decision not to condition its approval on prior acquisition of a permit from another agency was not arbitrary or capricious.

## IV

What is troubling about this case is that it appears that, if and when the project proceeds, some eagles may die or have their nests impaired diminishing reproduction.  But the protections given by our environmental laws are not absolute.  NEPA doesn't control any substantive result but rather requires procedural protections to ensure that a "hard look" was given to reasonable alternatives.  The Endangered Species Act doesn't absolutely prohibit all deaths of endangered species caused by development but rather prohibits the incidental taking of endangered creatures' lives if done without a permit that specifically allows the incidental take.  The Bald and Golden Eagle Protection Act doesn't outlaw every killing of the eagle, just take without a permit.

Of course, Tule must comply with BGEPA at all times during the construction and operation of the project.  While we recognize the legitimate concerns about the well-being of protected eagles raised by Plaintiffs and FWS, we are persuaded that those concerns can be addressed through the BGEPA permitting process.

At the same time, there are benefits to the Tribe and to the United States that will come from the project, and BIA

has a special concern to advance the interests of the Indian nations under its jurisdiction. While that would not justify disregarding environmental laws when clearly applicable, *see, e.g.*, *Anderson*, 371 F.3d at 494–502 (holding that Indian nation should be enjoined from hunting whales absent a permit under the MMPA), the interests of the Ewiiaapaayp Band of Kumeyaay Indians weigh in favor of the Tribe in this close case involving potentially competing values.

We therefore conclude that in the total circumstances of this case the EIS analysis was sufficient to satisfy NEPA. So far as the demands of NEPA and the APA are concerned, this project can proceed.

**AFFIRMED.**